UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 21-CV-1347

| | |
|---|---|
| Brenda Ann SMITH, | ) |
| | ) |
|     Plaintiff, | )    COMPLAINT |
| | )    SEEKING |
| v. | )    MONEY DAMAGES |
| | ) |
| CITY OF MINNEAPOLIS, a | )    DEMAND FOR |
| municipal entity; OFFICER DOES, | )    JURY TRIAL |
| in their *individual* capacity; | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## <u>GENERAL INTRODUCTION</u>

1.    This is an action under 42 U.S.C. § 1983 seeking money damages as compensation for Defendants' violation of Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

2.    This action also states common law claims for battery, assault, negligent infliction of emotional distress, and negligence pursuant to MINN. STAT. § 466.02.

3.    Plaintiff's claims against the unidentified police officers, referred to in this Complaint as Officer Does, are aimed at the Officer Does in their individual *and* official capacities (differentiated by claim).

4.    Plaintiff's claims against the City of Minneapolis, Minnesota seek to hold the municipality responsible for the actions of its agents and employees which include but are not limited to Minneapolis Mayor Jacob Frey, Minneapolis Police Chief Medaria Arradondo, and the heretofore unidentified Officer Does.

5.     Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343 and claim joinder is

       appropriate under Fed. R. Civ. P. 18.

6.     It is alleged that on May 30, 2020, one or more of Defendant Does, engaged in an

       action which resulted in the injury of Plaintiff and violated her constitutional

       rights under the Fourth Amendment to the United States Constitution, as made

       applicable to the States by the Fourteenth Amendment, as well as her rights to

       substantive due process and equal protection under the Fourteenth Amendment.

7.     The moving force behind Defendants' violations of Plaintiff's constitutional

       rights was, *inter alia*, the policies or customs of the City of Minneapolis and the

       Minneapolis Police Department, under the supervision of Minneapolis Police

       Chief Medaria Arradondo and Minneapolis Mayor Jacob Frey.

8.     On May 29, 2020, Defendant City of Minneapolis, through Minneapolis Mayor

       Jacob Frey, signed an emergency regulation to enact and enforce a curfew that

       unconstitutionally deprived Plaintiff of her rights under the First Amendment to

       speak and assemble, as made applicable to the states through the Fourteenth

       Amendment, and of her right to be present in public under the Privileges and

       Immunities Clauses of the Fourteenth Amendment and Article IV, § 2 of the

       Constitution.

9.     In enforcing the Mayor's actions on May 30, 2020, Defendant City of

       Minneapolis, through its agents—including the Minneapolis Police Department,

       Police Chief Medaria Arradondo, and Defendant Does— unconstitutionally

       deprived Plaintiff of her rights under the First Amendment to speak and assemble,

as made applicable to the states by the Fourteenth Amendment, and of her right to be present in public under the Privileges and Immunities Clauses of the Fourteenth Amendment and Article IV, § 2 of the Constitution.

10. On May 30, 2020, the City of Minneapolis, the Minneapolis Police Department and Officers Doe, committed unconstitutional misconduct, violating the Fourteenth Amendment's Equal Protection Clause by selectively enforcing Minneapolis Emergency Regulation 2020-2-1 against Plaintiff on the basis of Plaintiff's race and decision to exercise her First Amendment right to peaceably assemble to express her outrage at police brutality, racist policing practices, and the City's continuous, widespread, and pervasive pattern of attempting to censure populist dissent through the physical intimidation and arrest of nonviolent protesters and the deployment of chemical and less-lethal weapons against nonviolent protesters.

11. Defendant Does committed a common law battery against Plaintiff for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02.

12. Defendant Does committed a common law assault against Plaintiff for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02.

13. Defendant Does breached their duty of reasonable care to (1) forgo shooting Plaintiff in the foot at close range to cause injury and (2) give a reasonable path for Plaintiff to leave the premises in a constitutionally permissible manner. Defendant Does breached this duty by discharging "less-lethal" weapons in her

direction in an act of common law negligence for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02.

14. Defendant Does committed common law negligent infliction of emotional distress against Plaintiff for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02.

## **PARTIES**

### **Plaintiff: Brenda Ann Smith**

15. Plaintiff Brenda Ann Smith [hereinafter "Brenda"] was amongst those who assembled to peacefully protest the killing of George Floyd on May 30, 2020.

16. Brenda is a black woman; she is a racial minority in Minnesota.

17. Brenda is a fifty-four-year-old grandmother residing in Minneapolis, Minnesota.

18. Brenda was born in Forest City, Arkansas, and has been a United States citizen since birth.

19. Brenda has always taken pride in being active, especially since becoming a grandmother. She likes to be able to play and keep up with her grandchildren, which has been impossible since being injured by the Minneapolis Police Department and Officers Doe.

### **Defendant: City of Minneapolis**

20. Defendant City of Minneapolis [hereinafter "Minneapolis"] is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

21.     The Minneapolis Police Department [hereinafter "MPD"] is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

22.     Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

23.     Minneapolis Mayor Jacob Frey [hereinafter "Frey"] is and was at all times relevant to this action, the Mayor of Minneapolis and the chief policymaker responsible for implementing curfew orders and authorizing MPD's use of force.

24.     Minneapolis Police Chief Medaria Arradondo, [hereinafter "Arradondo"] is and was, at all times relevant to this action, the MPD police chief and a policymaker for his department.

### Defendants: Minneapolis Officer Does

25.     Brenda does not yet know the true names, capacities, or exact number of Officer Defendants present sued herein as Does, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege Defendant Does' true names and capacities when ascertained.

26.     All individual Doe Defendants are sued in both their individual and official capacities with the distinction being made on a claim-by-claim and officer-by-officer basis.

27.     For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Doe Defendants are sued in their *individual* capacity. While Plaintiff also faults Doe Defendants for

the actions they performed in their *official* capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

28.  For purposes of Plaintiff's state law claims, Doe Defendants are sued in their *official* capacity only.

29.  Plaintiff is informed, believes, and thereupon alleges that Defendant Doe, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

30.  Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Doe was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

31.  At all relevant times, Defendant Doe was acting under color of state law.

32.  Brenda is informed, believes, and thereupon alleges that the practices, policies, and customs of Minneapolis and/or the MPD were responsible for the unlawful action taken against Brenda.

## **JURISDICTION**

33.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 42 U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is appropriate as the events in question "derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## VENUE

34.   Venue properly lies in the District of Minnesota pursuant to 28 U.S.C. §

1391(e)(1) because all the events giving rise to this claim occurred in this district,

all Defendants reside in this district, and no real property is involved in this action.

## FACTUAL BACKGROUND

35.   On May 25, 2020, Minneapolis Police Officer Derek Chauvin knelt on George

Floyd's neck for more than eight minutes as Mr. Floyd cried out for his deceased

mother and his life slowly slipped away. Despite Mr. Floyd's pleas for help and

the protestations of onlookers, Officer Chauvin and two other officers, held him on

the ground, handcuffed behind his back, until well after he completely stopped

moving while a fourth officer prevented bystanders from intervening to save Mr.

Floyd's life. Mr. Floyd was murdered on the street in Minneapolis. He was

suspected of having attempted to pass a counterfeit $20 bill. Derek Chauvin has

been indicted for second-degree unintentional murder, second-degree

manslaughter, and third-degree murder in violation of MINN. STAT. §§ 609.19,

609.205, 609.195, respectively. The assisting officers have since been indicted for

aiding or abetting murder in the second degree in violation of MINN. STAT. §

609.19. On March 12, 2021, Minneapolis agreed to pay $27 million to settle a civil

lawsuit filed by George Floyd's family.

36.   On May 26, 2020, thousands of Minneapolis residents took to the City's public

streets and spaces to protest the unjustifiable killing of Mr. Floyd, as well as police

killings of other people of color. As City officials acknowledged, the vast majority

of these protesters exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

37.   On the evening of May 27, 2020, the Minneapolis Fire Department responded to a number of fires that occurred in the vicinity of the Third Precinct along Lake Street near the intersection with Hiawatha Avenue. Mayor Frey responded by declaring a state of emergency, citing fires and unrest in the Third Precinct and surrounding area.

38.   On May 28, 2020, the Fire Department again responded to a number of fires along Lake Street in the vicinity of the Third Precinct. Several additional fires also broke out in the vicinity of Broadway Avenue on the city's north side.

39.   In total, all the building fires experienced throughout Minneapolis, and the vast majority of the property crimes that prompted the order, were confined to two discrete areas around Lake Street on the south side, and Broadway Avenue on the north. Together, these areas constituted about four of Minneapolis' fifty-eight square miles.

40.   Over the full period in which the city implemented the state of emergency, half of Minneapolis' eighty-seven neighborhoods experienced no fire activity, protest related or otherwise.

41.   Fifty-three of Minneapolis' eighty-seven neighborhoods experienced no building fires.

42.   On May 29, 2020, Mayor Frey issued Emergency Regulation 2020-2-1, implementing a city-wide curfew between the hours of 8:00 PM on May 29, 2020

and 6:00 AM on May 30, 2020, and between the hours of 8:00 PM on May 30, 2020 and 6:00 AM on May 31, 2020.

43.  This order, in tandem with subsequent but similar measures, ultimately mandated that all Minneapolis residents throughout the City stay off the streets for seven consecutive evenings despite the fact that the fires and unrest that prompted the orders were largely confined to two relatively small areas, one along Lake Street, miles south of downtown, and the other centered on Broadway Avenue on the City's north side.

44.  In issuing the order, officials acknowledged that peaceful protesters would be caught up in the enforcement and indicated that anyone out beyond the curfew would be treated as if they were aiding and abetting those seeking to do property damage.

45.  Neither Minneapolis nor Mayor Frey made any attempt to narrowly tailor the geographic scope of the curfew order to those parts of Minneapolis most affected by civil disturbances.

46.  At the time Emergency Regulation 2020-2-1 was promulgated, Minneapolis had a population of roughly 416,000 people, meaning that the curfew order sought to prevent almost half a million residents from simply leaving their homes for 20 hours over two days (*i.e.*, for 41.66% of the two-day period). In other words, for at least two days, Minneapolis burdened substantially more speech, expression, and assembly rights than was necessary to accomplish its goal of safeguarding the public health, safety, and welfare; there was no reason to burden the First

Amendment rights of individuals in Minneapolis who were nowhere near any areas affected by civil disturbances. The breadth of this order is difficult to overstate.

47. Though Emergency Regulation 2020-2-1 states that it was promulgated to "protect the public health, safety, and welfare," the manner in which MPD enforced the emergency regulation causes Plaintiff to believe and allege that this statement of purpose was, in part, pretextual. Plaintiff believes and alleges that, because Emergency Regulation 2020-2-1 was used almost exclusively to target, arrest, intimidate, assault, and gas nonviolent protesters who were specifically protesting the City of Minneapolis and the Minneapolis Police Department, one the City's purposes for enacting Emergency Regulation 2020-2-1 was to quell dissent by depriving protesters of their First Amendment rights to assemble, speak, and express their displeasure with the City and its police department.

48. Minneapolis officials characterized the outright criminalization of First Amendment activity, and MPD's violent enforcement of the curfew order, as necessary to restore order.

49. Emergency Regulation 2020-2-1 did not leave open adequate alternative means of communication during the curfew hours. No public forums were available for protesters to use whatsoever, including sidewalks or streets. The emergency regulation, and the enforcement of the regulation, created an ambiance of martial law that prevented protesters from displaying signs or pictures, and further prevented protesters from having their voices heard. These restrictions sought to

and did prevent protesters from expressing their message to Minneapolis, to the MPD, and to the nation at large.

50. Plaintiff alleges, based on information and belief, that Minneapolis had notice prior to Plaintiff's injury that Emergency Regulation 2020-2-1 was being enforced by MPD in an unconstitutional manner in a widespread, continuous, and persistent pattern. Despite having notice of the unconstitutional conduct of its employees, Minneapolis evidenced deliberate indifference to or tacit authorization of this unconstitutional misconduct by failing to intervene and train or supervise its officers to respect the First Amendment rights of nonviolent protesters.

51. Based on the above six paragraphs, Plaintiff alleges that Emergency Regulation 2020-2-1 was a content-based restriction on Plaintiff's First Amendment rights. Plaintiff alternatively alleges that, if the emergency regulation was content-neutral, it nonetheless constituted an unreasonable time, place, or manner restriction on Plaintiff's First Amendment rights.

52. At the time Mayor Frey issued Emergency Regulation 2020-2-1, he acted under the color of the statutes, ordinances, regulations, customs, and usages of Defendant Minneapolis and the State of Minnesota under the apparent authority of his office as Mayor and MINN. STAT. § 12.29.

### The Shooting of Brenda Ann Smith

53. Plaintiff Brenda felt compelled to attend one of the protests in the aftermath of George Floyd's senseless slaying. Brenda was deeply affected after seeing the video of the murder and seeing and hearing George crying out for his mother.

As a mother herself, Brenda sought to exercise her constitutional rights to assemble in order to make known and voice her complete and utter dissatisfaction with the violence perpetrated by MPD officers against people of color, and particularly against black or brown individuals.

54.    On Saturday, May 30, 2020, Brenda rode with her daughter to the area surrounding the 5th Minneapolis Police precinct at 3101 Nicollet Avenue, Minneapolis, MN 55408.

55.    Protesters were gathered on the corner of 31st Street and Nicollet Avenue. There was a stage with speakers broadcasting and reputable organizations such as the NAACP were present.

56.    The peaceful crowd of hundreds of protesters chanted, cheered, and exuded unity in the call for justice. Law enforcement officers, presumably from the Minneapolis Police Department, atop the police precinct building, remained guarded behind dumpsters and barricades with weapons drawn.

57.    As darkness began to fall, officers, without provocation or warning, shot tear gas or other chemical agents to disperse the crowd and enforce the curfew order. Some members of the protest continued to shout, "No justice, no peace!" while a fog of tear gas engulfed the crowd. Other members of the crowd began to leave the scene.

58.    Brenda attempted to leave the area once the tear gas started, when suddenly someone standing next to her was shot directly in the middle of the forehead.

59.  In a hailstorm of shots and tear gas, Brenda fled the area in panic without regard to where she was headed. At the time, she believed that police officers were shooting live rounds and the lady next to her had died from her head wound.

60.  Brenda found herself at the underpass of Interstate 35W at Lake Street with McDonald's in plain sight. She repeatedly screamed for her daughter as she fled because they were separated.

61.  A row of at least ten officers protected with helmets and riot gear loomed in the underpass as Brenda approached. Brenda continued her path forward in her attempt to flee the scene without any word or directions from the officers.

62.  Suddenly and without warning, the officers began shooting. Only after shots rang out did they identify themselves by exclaiming, "This is the MPD!"

63.  Piercing pain in Brenda's right foot informed her that the Minneapolis Police Department had just shot her. Still screaming and more frightened than ever, she limped away from officers as shots continued to ring out. MPD continued shooting at Brenda as she attempted to flee.

64.  Two civilians ran back to Brenda's aid upon hearing her screams and realizing she had been shot. They supported Brenda to walk to the car and reunite with her daughter.

65.  It was only after Brenda reached the car that she got up the courage to look at her foot. Her shoe was wide open with blood gushing out of it.

66.  Another unidentified civilian bandaged Brenda's foot to momentarily suppress the bleeding.

## The Aftermath: Brenda's Medical Care

67.   Brenda's daughter drove her to another family member's house who took her to the emergency room at North Memorial Hospital. Brenda was given a wheelchair due to the difficulty of walking. While waiting for an hour to be seen, she told the medical staff that the police shot her at a protest.

68.   Brenda suffered severe pain in her foot due to the shooting. She received multiple injections of Dilaudid, a strong opioid to cope with the pain.

69.   A Hennepin County Sheriff entered Brenda's hospital room to inquire about Brenda's shooting. The officer asked if Brenda would be pressing charges and took her shoe to preserve evidence. However, Brenda demanded that her shoe be returned to her and the officer eventually complied.

70.   The doctor at North Memorial confirmed that Brenda's big toe was broken and that it was imperative that she follow up with podiatry due to the sensitivity of the injury.

71.   Brenda continued to suffer in pain following her visit to the emergency room. She received care from Allina Health Bandana Square Clinic where her podiatrist informed her after an MRI that, in addition to her broken toe, her ankle joints and ligaments were severely injured by the shooting.

72.   In July 2020 Brenda received ligament repair and syndesmosis stabilization surgery to repair her right ankle, less than one year after a previous surgery for the same ankle. Prior to the shooting, Brenda had recovered to near full capacity from her previous ankle surgery.

73.   The surgery left Brenda in severe pain for several months and forced her to use opioid pain killers to cope with the pain following the surgery.

74.   The doctor first placed Brenda in a hard cast for a period of roughly two to three months. Because Brenda lives alone, she struggled through daily tasks during her recovery. Brenda precariously balanced herself in and out of bed just to use the commode at her bedside, which she describes as a humiliating experience. Even small tasks such as bathing herself became arduous. She struggled through excruciating pain which was especially severe during the first few months.

75.   Prior to her injury, Brenda was diagnosed with chronic pain syndrome which causes her to suffer in pain long after any injury has healed.

76.   In September 2020, Brenda started the long journey to walk again using a walking boot and attending physical therapy sessions regularly.

77.   Brenda's long and difficult recovery continues to present day. This previously active grandmother now cannot stand on her leg for more than a few hours at a time, is hindered from throwing a football with her nephew, and has been forced to rely on Metro Transit transportation.

78.   Brenda's depression has significantly worsened as a result of the shooting. Despite a cordial relationship with the police, Brenda now suffers from Post-Traumatic Stress Disorder (PTSD) symptoms and has lost all trust in the police.

**MPD's Custom of Excessive and Disproportionate Use of Force**

79.     MPD officers have a long history of engaging in excessive force against the

civilians they are sworn to protect. These incidents represent a custom that MPD,

and by extension Minneapolis, has long ignored and tacitly approved of.

80.     MPD's use of excessive force is so widespread that the Attorney General of the

United States announced on April 21, 2021 that the "Justice Department has

opened a pattern or practice investigation into the City of Minneapolis (the City)

and the Minneapolis Police Department (MPD). The investigation will assess all

types of force used by MPD officers, including uses of force against…

individuals engaged in activities protected by the First Amendment. The

investigation will also assess whether MPD engages in discriminatory policing.

As part of the investigation the Justice Department will conduct a comprehensive

review of MPD policies, training and supervision. The department will also

examine MPD's systems of accountability, including complaint intake,

investigation, review, disposition and discipline."[1]

81.     The Attorney General's investigation "'will assess whether the Minneapolis

Police Department engages in a pattern or practice of using excessive force.'" *Id.*

(quoting Attorney General Garland).

---

[1] *Attorney General Merrick B. Garland Announces Investigation of the City of Minneapolis, Minnesota, and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE (Apr. 21, 2021), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-investigation-city-minneapolis-minnesota-and.

82.    A Star Tribune review[2] found at least eleven instances since 1995 in which MPD officers were accused of punching, kicking, or otherwise assaulting people who were already restrained. It is unknown how many instances actually occurred since not every case attracted media attention or resulted in lawsuits or criminal charges.

83.    In 2010, MPD officers killed David Cornelius Smith, who was suffering a mental health breakdown, through the use of tasers and an overly aggressive restraint.

84.    The officers involved in the death of David Cornelius Smith were not criminally charged or disciplined. The Internal Affairs Unit never interviewed them.

85.    In 2013, Minneapolis Terrence Franklin was chased into a basement and shot dead by five MPD officers.

86.    The officers who killed Terrence Franklin were not criminally charged or disciplined.

87.    In 2014, MPD officers choked, punched, and handcuffed Alfred Flowers before continuing the beating by stomping and kicking him as he laid on the ground.

88.    The officers who assaulted Alfred Flowers were not criminally charged or disciplined.

89.    Again in 2014, former MPD officer Tou Thao beat Lamar Ferguson on the streets of Minneapolis. The officer punched, kicked, and kneed Ferguson while

---

[2] Libor Jany, *Chauvin Case Shines Spotlight on Minneapolis Police History of Mistreatment of Handcuffed Suspects*, STAR TRIB. (Apr. 2, 2021), https://www.startribune.com/chauvin-case-shines-spotlight-on-minneapolis-police-history-of-mistreatment-of-handcuffed-suspects/600041721.

he was handcuffed. Ferguson's teeth were shattered, and he was hospitalized for four days.

90.    Thao remained on the force and would later be involved in the murder of George Floyd, on May 25, 2020. At the time of George Floyd's murder, Thao had six police conduct complaints filed against him—one remained pending. The other five were closed without discipline.

91.    In 2015, Minneapolis resident Jamar Clark was shot and killed by MPD officers.

92.    The officers involved in Jamar Clark's death were not criminally charged or disciplined.

93.    In 2016, Minnesota Vikings player Tom Johnson was maced and tasered after MPD officers initiated a confrontation with him.

94.    Both officers involved had been previously sued for unreasonable use of force. Neither faced criminal charges or discipline for the altercation with Johnson.

95.    Again in 2016, MPD officers kicked and struck Tomas Garcia-Orihuela as he laid handcuffed on the ground. One of the officers involved had previously been named in two excessive force lawsuits.

96.    In 2017, unarmed Minneapolis resident Justine Ruszcyk was shot and killed in her backyard by former MPD officer Mohamed Noor.

97.    In 2018, an MPD officer drop-kicked Jeremiah Jermaine Thomas in the chest before additional MPD officers joined in. The officers punched, kneed, and kicked him, causing a punctured lung, internal bleeding, and fractured ribs.

98.     In each of the previously listed cases, settlements were reached. This evinces that Defendant Minneapolis was on notice of MPD's ongoing pattern of reckless violence, as the Mayor is notified of all litigation brought against the City and must approve all settlements.

99.     The City paid $25,270,182.52 in settlements, claims, or judgments in 274 police misconduct cases between 2003 and April 2019.

100.    Derek Chauvin, who was ultimately convicted of second-degree murder for the death of George Floyd, personifies MPD's failure to discipline officers.

101.    Before May 25, 2020, at least eighteen complaints were filed against Chauvin, many of which alleged misconduct or excessive force. Only two of those complaints were closed with discipline.

102.    Despite his extensive record of citizen complaints, Derek Chauvin was on duty as an MPD officer on May 25, 2020, when he knelt on George Floyd's neck for more than eight minutes. Floyd was prone and handcuffed, yet Chauvin continued kneeling while Floyd pleaded for help, slipped into unconsciousness, and ultimately died.

103.    Before Chauvin was convicted of Floyd's murder, the City of Minneapolis settled with Floyd's family for $27 million. Thus, between 2003 and 2021, the City of Minneapolis has paid *at least* $52,270,182.52 in settlements, claims, or judgments arising out of alleged brutality and unconstitutional conduct by the City's police officers.

104. Additionally, in 2019, MPD officers repeatedly tasered Champaigne Lynn Hale and Leonadis John Evans in their backyard, in what was described as a police riot, prompting the county to drop criminal charges against the women. The event was widely reported.

105. Impunity is the norm for the MPD. From 2013 through the first quarter of 2021, the Office of Police Conduct Review ("OCPD") received over 2,500 misconduct complaints (excluding over 1800 complaints that were found to be over 270 days from the incident, did not allege police misconduct, or were outside OCPD's jurisdiction).  Of those over 2,500 complaints, 283 were explicitly listed as "excessive force" complaints, while almost 1,000 were more generically labeled "violations of policy or procedure." Only 90 of the more than 2,500 complaints between 2013 and quarter 1 of 2021 resulted in discipline (excluding "coaching," which OCPD defines as complaints being sent to the officer's supervisor for policy education at the precinct, and which appears to be discretionary because half of the "coaching" listed resulted in no coaching being given to the officer at issue). Thus, there was "discipline" in roughly 3.5% of police complaints. It is unclear from OCPD's data whether the discipline listed was final or was appealed. Of the 90 instances of discipline from 2013 to quarter 1 of 2021, 38 of those instances, or almost half, took place in 2020. In the past seven years, only 31 complaints ended in serious discipline. Plaintiff alleges that more than 31 of these complaints should have ended in serious discipline and more than 90 of the 2,500 complaints should have resulted in discipline.

106. MPD's Code of Conduct and Use of Force policy manual in effect at all relevant times explicitly mandates that officers use only "the amount of force that is objectively reasonable in light of the facts and circumstances… The force used shall be consistent with current MPD training."

107. The lack of discipline in these ongoing incidents of excessive force suggests that MPD and the City are not enforcing the policies within the manual, creating a pattern and culture that tolerates the use of excessive force.

108. Alternatively, if the excessive force used by officers is, in fact, "consistent with current MPD training," MPD and the City are actively encouraging and condoning the use of excessive force.

109. MPD's culture accepts and allows the use of excessive force as a customary part of the job.

110. All MPD officers are represented by the Police Officer's Federation of Minneapolis. The federation provides union representation to all officers and negotiates on their behalf with the city.

111. The federation's elected president at the time of this incident, Lieutenant Robert Kroll ("Kroll"), acted as an unofficial policymaker within the MPD. As the president of the union, Kroll was an important culture maker in the office and he acted as a de facto policy maker for many of the officers. As president, his election by MPD officers in their affirmative choice of him as a leader reflects on the culture of the department.

112.   Kroll's June 2 statement to federation members underscores his influence

throughout the department:

> What has been very evident throughout this process is you have
> lacked support from the top. I've noted in press conferences from
> our mayor, our governor, and beyond, how they refuse to
> acknowledge the work of MPD and continually shift blame to it. It
> is despicable behavior.  How our command staff can tolerate it and
> live with themselves I do not know... Although I have not been
> visibly present, I am closely monitoring what is occurring.  I
> commend you for the excellent police work you are doing... I've had
> numerous conversations with politicians at the state level. I gave a
> detailed plan of action including a range of 2000 to 3000 National
> Guard, their deployment allocations throughout our city and St. Paul,
> in a phone meeting with Senate majority leader Paul Gazelka. I've
> worked with other police leaders from New York to Las Vegas to
> push our messaging on a national level.

These are not the words of a standard lieutenant; they are the words of a

man who set the tone and culture department-wide.

113.   Kroll is a member of the City Heat motorcycle club, which has been known to

regularly display white supremacist symbols.

114.   Minneapolis permitted so called warrior training, which prepares police to do

battle with civilians, until 2019.

115.   After 2019, the Police Federation, headed by Kroll, offered free warrior training

to Minneapolis officers. The union was not subject to censure or reprimand for

engaging in this conduct.

116.   No efforts were made to prevent officers from engaging in warrior training

programs despite a clear awareness regarding its popularity amongst officers and

Minneapolis officials' awareness of the propensity to result in violence perpetuated towards citizens.

117. As recently as May 15, 2021, the MPD made headlines for yet another instance of excessive force and subsequent misconduct from February 2020.[3] MPD officers beat Andre Moore during a traffic stop, leaving him with a bloodied, swollen face and a broken nose. One of the officers involved, Tony Partyka, went on to apply for a no-knock warrant for Moore's apartment.

118. After several aspects of the warrant raised red flags, a Hennepin County judge found that Partyka intentionally misled the court about his claims of a confidential reliable informant. If the informant existed at all, he was merely a "tipster."

119. After beating Moore, lying to the Hennepin County Court, and conducting an unconstitutional drug raid on Moore's apartment, Partyka was given no discipline by Minneapolis police.

120. This pattern of inadequate discipline for inappropriate and unlawful action extends throughout the entirety of the MPD.

121. The City has been deliberately indifferent to the unlawful acts of their officers, including but not limited to the named officer Defendants, and has indemnified them for unlawful acts committed off-duty and on-duty.

---

[3] Andy Mannix, *Botched Minneapolis Drug Case Raises Questions Over Secrecy of Informants*, STAR TRIB. (May 15 2021), https://www.startribune.com/minneapolis-drug-case-falls-apart-raising-questions-about-existence-of-secret-informant/600056732.

122.   By failing to discipline its officers (including Defendants) for conduct that the City knows about and which violated constitutional or federal laws, the City has effectively informed the officers that they are above the law, thereby tacitly authorizing Defendants' unlawful conduct.

### MPD's Custom of Using Excessive Force Against Compliant Civilians and Nonviolent Protesters

123.   Minneapolis enforced Emergency Order 2020-2-1 through a massive deployment of the MPD, National Guard troops, and a consortium of law enforcement agencies, all of whom were authorized to use force against anyone outdoors after curfew regardless of whether such use of force was necessary to gain compliance.

124.   Even before curfew was in place, MPD officers maced protesters from their vehicles without warning and despite an absence of threat or justifiable provocation. This occurred on multiple occasions including on May 28, involving Annette Williams, and by a series of MPD police SUVs including vehicle number 352 during broad daylight while exiting Washington Ave onto Interstate 35W.

125.   During the enforcement of the curfew, police officers deployed tear gas against prone, nonresistant misdemeanants who were not engaged in any civil disturbance.

126.   During the enforcement of the curfew, Minneapolis PD "peace" officers fired "less-lethal" and supposedly non-lethal projectiles indiscriminately into crowds of nonviolent protesters on May 30, 2020.

127.   During the enforcement of the May 30, 2020 curfew, police officers fired "less-lethal" paint projectiles at Tanya Kerssen as she stood on her own porch despite an absence of threat or justifiable provocation.

128.   During the enforcement of the curfew, police officers attacked protesters from moving vehicles on May 30, 2020.

129.   On May 30, 2020, police opened fire with "less-lethal" projectiles on a clearly marked medical encampment set up to treat injured individuals in the K-Mart parking lot located at 10 W. Lake Street, Minneapolis, MN 55408, despite health care providers compliance with orders to raise their hands.

130.   During the enforcement of the curfew, police officers fired "less-lethal" projectiles at clearly marked press personnel despite a clear exception permitting their presence in public.

131.   Members of the press who were attacked by police officers during this time include, *inter alia*: John Minchillo (May 29, 2020), Molly Hennessy-Fiske (May 30, 2020), Michael George (May 30, 2020), John Marschitz (May 30, 2020), Carolyn Cole (May 30, 2020), Ryan Faircloth (May 30, 2020), Chao Xiong (May 30, 2020), Linda Tirado (May 30, 2020), Ali Velshi (May 30, 2020), Julio-Cesar Chavez (May 30, 2020), Lucas Jackson (May 30, 2020), and Susan Ormiston (May 30, 2020).

132.   During the enforcement of the curfew, police officers failed to give any instruction to protesters on May 30, 2020 near the Fifth Police Precinct as the curfew set in. Despite a typical exemption for members of the press, officers

subjected journalists to a barrage of tear gas, pepper spray, and rubber bullets

without warning. LA Times reporter Molly Hennessy-Fiske writes, "The officers

started by firing tear gas indiscriminately into the street. We watched, cameras

rolling. But instead of passing, the officers turned, backed us up against the

precinct wall and fired… The officer said nothing, just kept firing… We realized

we had to run, too. We were not exempt. They were treating us as scofflaws. We

tried to move along the wall, but **it wasn't clear where the officers wanted us**

**to go**. **They issued no order, just fired.**"  Molly Hennessy-Fiske, *Times*

*reporter recounts being hit with rubber bullets by Minnesota police*, LA Times

(May 30, 2020) (emphasis added).[4]

133.   During the enforcement of the curfew, police officers kettled protesters in order

to prevent their dispersing prior to curfew and then moved in to arrest them,

striking protesters with batons and pepper spray. This occurred on May 31, 2020

near the intersection of Washington Ave. and Interstate 35W where nearly 150

protesters were prevented from dispersing prior to curfew and subsequently

gassed and arrested en masse.

134.   During the enforcement of the curfew, police officers held arrestees in close

proximity to one another despite the government's own social distancing

guidelines implemented in response to the COVID-19 pandemic.

135.   These actions were widely reported by local, regional, and national news outlets

---

[4] *See* https://www.latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police.

and through social media; Mayor Frey and Chief Arradondo were aware of the ongoing excessive force complaints.

136.    Photojournalist Lucas Jackson reported "[i]t's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."

137.    Mayor Frey and Governor Walz acknowledged ongoing use of excessive force used against peaceful protesters as an unfortunate result of curfew enforcement.

138.    This massive use of force was authorized, either explicitly or tacitly, by Defendant Minneapolis through its agents: Mayor Frey and Chief Arradondo. This is evidenced through warnings issued at the time the curfew was implemented and by the pervasive use of force by MPD and other law enforcement agencies employed at all times throughout the relevant time period.

139.    Minneapolis Police Department spokesperson John Elder admitted to the use of less-lethal 40mm foam marking rounds in June 2020. These less-lethal marking rounds have the capacity to cause blunt trauma to maximize incapacitation potential.

140.    Following the use of these less-lethal rounds in May and June 2020, over half of injured protesters studied by the University of Minnesota reported injuries

requiring medical attention as a direct result of projectiles shot by the police.[5] With a range in the severity of injuries among participants, a clear message emerged from the study: "projectiles are not appropriate for crowd control."

141. Section 5-305(C) of MPD's Use of Force Policy ("MPD UFP") that was in effect on May 30, 2020 at the time of Plaintiff's injury notes that the use of a less-lethal weapon "may constitute the use of deadly force."

142. Less-lethal 40mm foam rounds of the sort used against Plaintiff constitute weapons capable of inflicting deadly force, as they can easily cause death or great bodily harm when they strike individuals in certain areas including but not limited to the throat, head, neck, face, or groin.

143. Section 5-312 of the MPD UFP that was in force at the time of Plaintiff's injury addressed "civil disturbances" and provided that MPD officers are permitted to deploy "any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance" once "authorized by the on-scene incident commander" *even if* "there is [no] immediate need to protect oneself or another from apparent physical harm."

---

[5] *See Injuries from Less-Lethal Weapons during the George Floyd Protests in Minneapolis*, N. Eng. J. Med. 384:774-775 (February 25, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2032052, *see also* Randy Furst, *Study: 'Less Lethal' weapons used by police during George Floyd Protests 'not appropriate,' caused significant injuries*, STAR TRIB. (January 14, 2021), https://www.startribune.com/study-less-lethal-weapons-used-by-police-during-george-floyd-protests-not-appropriate-caused-signifi/600010231/?refresh=true.

144. Outside of the context of civil disturbances, the MPD UFP in force at the time of Plaintiff's injury only permitted officers to use less-lethal 40-millimeter launchers and impact projectiles "where maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject." MPD UFP (May 30, 2020) § 5-317, Part II.

145. The MPD UFP in force at the time of Plaintiff's injury provided that "Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possibly death." MPD UFP (May 30, 2020) § 5-317, Part IV, § B.2.

146. When Mayor Frey announced via Emergency Regulation 2020-2-1 that a "civil disturbance" had occurred in the same order he declared a city-wide curfew, this signaled that Minneapolis tacitly authorized MPD to treat all curfew violations as "civil disturbances," allowing MPD to thereby deploy less-lethal weapons and chemical agents against nonviolent and non-aggressive subjects to enforce the curfew orders. Moreover, Minneapolis had notice as early as May 28, 2020 or May 29, 2020 that this is how MPD was interpreting Emergency Regulation 2020-2-1. With that amount of notice, Minneapolis and the MPD had the opportunity to change tactics in a manner that did not treat all curfew violations as civil disturbances. Minneapolis's failure to intervene before Plaintiff's injury occurred evidenced the City's deliberate indifference to or tacit authorization of MPD's widespread, continuous, and persistent pattern of unconstitutional misconduct.

147.    Even if this use of force was not explicitly authorized by Defendant Minneapolis, it resulted from the city's failure to supervise or provide adequate instruction to their officers despite their awareness of the ongoing issues.

148.    Even prior to the curfew, MPD officers have an extensive history of engaging in excessive force against unarmed civilians; MPD also has a history of unconstitutionally deploying less-lethal weapons and chemical agents against nonviolent protesters in situations that do not constitute "civil disturbances." The City is aware of these practices but has done nothing to intervene; the City has failed to train its officers not to use excessive force and has failed to train its officers how to respond to mass demonstrations or protests in a manner that protects the First Amendment rights of protesters.

149.    After the death of Jamar Clark in 2015, Minneapolis experienced 18 days of protests similar to those in May and June of 2020.

150.    After the Jamar Clark protests, the United States Department of Justice Office of Community Oriented Policing Services ("COPS Office") conducted an "After-Action Assessment of the Police Response" ("Assessment").[6]

151.    The COPS Office found that "MPD employees deployed less-lethal and non-lethal weapons without clear authorization from the incident commander, in

---

[6] *See* FRANK STRAUB ET AL, MAINTAINING FIRST AMENDMENT RIGHTS AND PUBLIC SAFETY IN NORTH MINNEAPOLIS: AN AFTER-ACTION ASSESSMENT OF THE POLICE RESPONSE TO PROTESTS, DEMONSTRATIONS, AND OCCUPATION OF THE MINNEAPOLIS POLICE DEPARTMENT'S FOURTH PRECINCT, U.S. DEP'T OF JUSTICE (Mar. 20, 2017), https://cops.usdoj.gov/RIC/Publications/cops-w0836-pub.pdf.

violation of policy." Assessment at 54. The Office then recommended that MPD
"establish a clear incident commander and strengthen, train on, adhere to, and
enforce the use of force policy—especially as it relates to civil disturbances."
Assessment at 55.

152.    The COPS Office found that "MPD deployed chemical agents without prior
authorization, in violation of policy." Assessment at 55. The Office then
recommended that MPD "strengthen, train on, adhere to and enforce the use of
force policy—especially as it relates to the use of chemical agents." *Id.*

153.    The COPS Office found that "[t]he Minneapolis Police Department ***did not have
adequate department-wide training*** on crowd management, negotiated
resolution, de-escalation, the use of personal protective equipment, or the use of
less-lethal instruments" prior to the Jamar Clark protests. Assessment at 61
(emphasis added). The Office recommended that MPD personnel be trained on
crowd management tactics consistent with national best practices.

154.    The COPS Office found that MPD "had inadequate policy, guidelines, training,
and equipment for crowd management." Assessment at 62. The Office
recommended that MPD: (1) develop written policies, guidelines, and training
that "build on police best practices for crowd management, negotiated resolution,
de-escalation, problem-solving, and force restraint," (2) "employ tiered
intervention and response strategies consistent with the challenges posed by
demonstrators, recognizing the department's priority is to value and preserve
human life, with a strategic goal of de-escalation, containment, prevention of

further escalation, and officer safety," and (3) "train all personnel in crowd

management operations in order to strengthen the capacity for a coordinated

response to civil disturbances." Assessment at 62.

155.   The COPS Office found that "[n]o departmental policy currently exist[ed] on

[Mobile Field Force ("MFF")] equipment type, use, or training" and "no policy

exist[ed] to define who receive[d] equipment, training on equipment, or the

inspection or deployment of equipment." Assessment at 62. The Office

recommended that MPD develop such policies and ensure proper training and

issuance of MFF equipment. *Id.*

156.   The COPS Office found that at the time of the report, "no unified training of

MFF units accompanie[d] identified MFF equipment." Assessment at 63. The

Office recommended that MPD establish a team to "help identify and

recommend the types of MFF equipment needed within MPD to effectively

manage major events and demonstrations and "[d]evelop regular training on the

various types of equipment." *Id.*

157.   The Assessment found that:

> The Minneapolis Police Department did not have adequate department-
> wide training on crowd management, negotiated resolution, de-
> escalation, the use of personal protective equipment, or the use of less-
> lethal instruments prior to the occupation.

> The last documented department-wide training regarding crowd
> management strategies and tactics was conducted in preparation for the
> 2008 RNC.

Assessment at 61.

158. The Assessment recommended, "[a]t a minimum," that "future department-wide training should include," *inter alia*, (1) "First Amendment rights and protections, legitimacy, and procedural justice," (2) "Crowd management, MFF operations, de-escalation, negotiated management, and problem solving," and (3) "Use of force and less-lethal instrument deployment in accordance with MPD's recently released use of force policy and best practices." *Id.* The Assessment also provided that "MPD should provide annual training and updates to all members of the department regarding its policies and procedures regarding civil disturbances." *Id.*

159. Based on MPD's horrible response to the George Floyd protests, Plaintiff believes and alleges that Minneapolis provided no training or grossly insufficient training on this issue to MPD before May 30, 2020.

160. The Assessment found that "[t]he Minneapolis Police Department had inadequate policy, guidelines, training, and equipment for crowd management." Assessment at 62. The Assessment recommended, inter alia, that "[t]he MPD should train all personnel in crowd management operations in order to strengthen the capacity for a coordinated response to civil disturbances." *Id.*

161. Based on MPD's horrible response to the George Floyd protests, Plaintiff believes and alleges that Minneapolis provided no training or grossly insufficient training on this issue to MPD before May 30, 2020.

162. The Assessment contains various minute details excoriating the crowd management and use of force customs adopted by MPD before and during

MPD's response to the Jamar Clark protests. The Assessment notes that MPD used chemical agents and less-lethal weapons without prior authorization, "including against demonstrators who were trying to administer first aid to the five shooting victims the night of November 23." *Accord id.*, pp. 54-55, 61-62.

163. Based on the Assessment's contents, Plaintiff alleges that MPD's use of less-lethal weapons and chemical agents during the 2015 Jamar Clark protests was unconstitutional.

164. Plaintiff alleges that the City of Minneapolis had knowledge of the contents of the Assessment prior to May 30, 2020.

165. Despite the findings and recommendations from the COPS Office, the City of Minneapolis made no changes to the MPD Code of Conduct Use of Force Policy on Civil Disturbances prior to June 2020. *See* MPD UFP § 5-312.

166. Despite the findings and recommendations, the City of Minneapolis made no changes to the MPD Code of Conduct Use of Force Policy on Use of Chemical Agents prior to June 2020. *See* MPD UFP § 5-313.

167. Despite the findings and recommendations, the City of Minneapolis made no changes to the MPD Code of Conduct Use of Force Policy on Use of Impact Weapons prior to June 2020. *See* MPD UFP § 5-315.

168. Despite the findings and recommendations, the City of Minneapolis made no changes to the MPD Code of Conduct general Use of Force Policy, State Requirements, or Use of Force Definitions prior to June 2020. *See* MPD UFP §§ 5-301.01; 5-301.02; 5-302.

169.    In short, MPD policies found to be inadequate by the Department of Justice were still in effect at all times relevant to this action.

170.    In October 2020, the United States Justice Department announced the creation of the National Response Center Initiative to assist the Minneapolis Police Department to "review, enhance and reform policies and practices to prevent the use of excessive force." In referring to this new initiative, Assistant Attorney General Eric S. Dreiband for the Civil Rights Division said, "[w]e seek to ensure public safety and eliminate excessive force by the police." Chief Medaria Arradondo noted that Minneapolis was creating a "new MPD."

171.    Additionally, at the micro-level, by the time Plaintiff was injured on May 31, 2020, the City of Minneapolis had adequate notice that MPD was systematically using excessive force against nonviolent protesters at the George Floyd protests. Between May 25, 2020 and May 31, 2020, MPD's adopted a policy or custom of using excessive force against nonviolent protesters at the George Floyd protests. Because these issues were widely reported and acknowledged by government officials, it is clear the City of Minneapolis had notice of this policy or custom on or before May 31, 2020. Mayor Frey also acknowledged this was occurring during various press conferences.

## INJURIES

172.    At minimum, the injuries Brenda suffered rise to the level of "substantial bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.7a.

173.  The injuries Brenda suffered also rise to the level of "great bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.8.

174.  Brenda suffered significant damage to her toe and ankle as a result of being shot by MPD with a rubber bullet or 40mm foam projectile on May 30, 2020.

175.  Both emergency room medical staff and a podiatry surgeon confirmed Brenda's broken toe injury directly following the May 30, 2020 event. This was not a preexisting injury.

176.  Following an MRI on her right ankle, Brenda was confirmed to have reinjured her right ankle syndesmosis and ostreochondritis lesion of the talus. The reinjury of her ankle would not have occurred but-for this shooting incident.

177.  Brenda underwent additional surgery, has suffered in excruciating pain over the past year, and continues to attend physical therapy sessions in order to heal her right ankle.

178.  To this day, Brenda still suffers from pain due to this injury caused by Defendants.

179.  Minnesota courts have well established that "[w]here a tort is committed, and injury may reasonably be anticipated, the wrongdoer is liable for the proximate results of that injury, although the consequences are more serious than they would have been, had the injured person been in perfect health." *Ross v. Great N. Ry. Co.,* 111 N.W. 951, 953 (1907).

180.  Defendants are therefore liable for the real physical injuries caused by shooting her in the foot with less-lethal weapons.

181.   The following are photos of Brenda's shoe following the shooting and her foot

following surgery:



182.   This shooting sent Brenda into a prolonged depressive state when she suffered

from loneliness and the struggles of recovery while living alone.

183.   Despite previous positive relationships with police officers, this shooting has made Brenda extremely hesitant to call the police if she were to need them. It has engendered in her a serious distrust of police officers, even those that were not present prior to this incident. In this manner, it has deprived her of equal access to justice and protection.

184.   Defendants' actions caused Brenda to incur additional monetary costs.

185.   Brenda has been out of work, unable to stand for long periods of time as a result of this injury.

186.   Brenda must rely on medical assistance rides for transportation as a result of this injury.

187.   Brenda has suffered extreme emotional distress and depression, in the form of pain and suffering, as a result of Defendants' intentional actions.

## **CLAIMS FOR RELIEF**

188.   Defendant Does' unprompted, unnecessary, and unannounced shooting of Brenda violated Brenda's Fourth Amendment right to be free from unreasonable seizures.

189.   Defendants Does' unprompted, unnecessary, and unannounced shooting of Brenda violated Brenda's Fourteenth Amendment rights to substantive and procedural Due Process.

190.   Defendant Minneapolis' policies and customs of encouraging and tacitly approving of known and excessive force were the moving force behind Defendant Does' conduct in a manner sufficient for liability to attach under

*Monell* and *Canton*. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

191.  Defendants Does' unprompted, unnecessary, and unannounced shooting of Brenda constitutes a common law battery under Minnesota tort law.

192.  Defendants Does' unprompted, unnecessary, and unannounced shooting of Brenda constitutes a common law assault under Minnesota tort law.

193.  Defendants Does' unprompted, unnecessary, and unannounced discharge of his or her weapon towards Brenda constitutes negligent infliction of emotional distress under Minnesota tort law.

194.  Defendants Does' unprompted, unnecessary, and unannounced discharge of his or her weapon towards Brenda constitutes negligence under Minnesota tort law.

195.  Defendant Minneapolis' implementation of Emergency Regulation 2020-2-1, as well as its enforcement by Chief Arradondo and Officer Does, violated Brenda's First Amendment rights to Free Speech, Assembly, her Fourteenth Amendment rights to travel and be present in public under the Privileges and Immunities Clause, and her Fourteenth Amendment right to Equal Protection of the law, which includes the right to be free from selective enforcement of laws on the basis of race or content-based expression.

**Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation**

(Plaintiff v. Officer Does)

196.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

197. By shooting Brenda in the foot, Defendant Does violated her constitutional right to be free from unreasonable seizures and excessive force.

198. "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement…" *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

199. The Supreme Court recently determined that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021).

200. A seizure is completed when officers shoot a person with the intent to restrain. *Id*.

201. Defendants clearly applied physical force to restrain Brenda's movement when they shot her in the foot. This application of force constitutes a seizure under the Fourth Amendment.

202. "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

203. In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is

actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

204. Courts should also consider "the availability of alternative methods" when determining the reasonableness of the officer's conduct. *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

205. The Eight Circuit has "clearly established that use of stun gun on nonviolent misdemeanor arrestee would constitute unreasonable exercise of force." *Brown*, 574 F.3d at 491.

206. Given that the use of a stun gun lies lower on the continuum of force than the use of paint canisters and rubber bullets, the use of such "less-lethal" projectiles against a compliant *suspected* misdemeanant, without warning, must also constitute a patently unreasonable use of force as a matter of law.

207. None of Brenda's actions can be construed as a threat to Defendant Does.

208. Brenda was suspected of nothing more than violating curfew, a misdemeanor offense.

209. MPD officers failed to give any warning to disperse or instruction as to the correct exit route. Brenda therefore logically continued her attempt to leave in the direction she was already headed.

210. Brenda was alone and searching for her daughter.

211. Accordingly, nothing could justify Defendant Does in firing upon Brenda with a rubber bullet or alternative less-lethal projectile.

212.   Minnesota precedent also indicates that striking a protester in the chest with a riot baton, without warning, without an attempt to apprehend, and without attempting to render aid precludes a finding of qualified immunity because the "law governing police use of excessive force was clearly established [as early as] 1990." *Baker v. Chaplin*, 517 N.W.2d 911 (Minn. 1994).

213.   Due to precedent indicating that Defendant Does' conduct was clearly unlawful, Defendant officers were aware of the unlawful nature of their conduct.

214.   Because of this notice, and because of the unreasonable nature of their conduct, Defendant Does are not entitled to qualified immunity.

215.   Regardless of permission to use less than lethal force during the protest, officers or government officials need only be individually involved to be held liable for their unconstitutional actions. *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 806 (8th Cir. 2010), *see also Quraishi v. St. Charles Cty., Missouri*, 986 F.3d 831, 837 (8th Cir. 2021).

216.   Moreover, "a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

217.   The additional unknown Doe officers who did not fire upon Brenda are also liable for their failure to stop their fellow officer given their concurrent failure to announce themselves, to seek to apprehend Brenda, and their subsequent failure to render any aid.

218.   Brenda suffered serious bodily harm as a direct and proximate result of
Defendants' actions, including but not limited to, physical injury, financial
injury, emotional trauma, loss of access to justice, and pain and suffering.

219.   Thus, Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

### Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Brenda's Substantive Due Process Rights

(Plaintiff v. Officer Does)

220.   Plaintiff realleges and incorporates herein by reference all preceding and all
subsequent paragraphs of this Complaint.

221.   When a defendant acts deliberately, an objective standard is appropriate in the
context of excessive force claims brought pursuant to the Fourteenth
Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

222.   Whether the force used against an individual violated substantive Due Process
rights under the Fourteenth Amendment turns on "the relationship between the
need for the use of force and the amount of force used; the extent of the
plaintiff's injury; any effort made by the officer to temper or to limit the amount
of force; the severity of the security problem at issue; the threat reasonably
perceived by the officer; and whether the plaintiff was actively resisting."
*Kingsley*, 576 U.S. 389, 397 (2015).

223.   None of these factors apply to Brenda who was unarmed and attempting to leave
the area after a protest.

224. The force applied to Brenda was sufficient to cause grievous injury, rising to the level of great bodily harm, to her ankle and foot.

225. Brenda made no effort to resist officers, made no motion towards Officer Does, and did not carry or appear to carry anything that suggested she might be armed.

226. Brenda suffered a broken toe, ankle syndesmosis and ostreochondritis lesion of the talus, and required intensive surgery as a result of being shot in the foot.

227. Defendant Officer Does made no attempt to deescalate the situation or give instructions about a proper exit strategy and instead resorted immediately, and without warning, to the use of "less-lethal" projectiles, the very name of which illustrates their inappropriateness in this context.

228. Brenda attempted to leave the scene and to search for her daughter. She made no movement towards them and did not resist officers in any way.

229. Brenda suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

230. Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 3: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Brenda's Right to Procedural Due Process

### (Plaintiff v. Officer Does)

231. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

232. "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v. Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

233. Brenda had such a liberty interest created by MINN. STAT. § 629.33 to be informed that she was subject to seizure before the officer applied any force in seizing her.

234. Brenda had a liberty interest in freedom from the use of *any* force by a police officer unless she fled or forcibly resisted. *Id.*

235. Brenda also had a liberty interest under MINN. STAT. § 629.32 to be free from "any more restraint than is necessary for [her] arrest and detention."

236. These interests relate to Brenda's constitutional right to be free from physical seizure without due process of law, a right which is amongst the most important rights guaranteed by the U.S. Constitution.

237. Shooting Brenda without warning amounted to a punishment for her suspected misdemeanor crime—*i.e.*, violating curfew—without the benefit of notice of her seizure and a trial.

238. By shooting Brenda without warning, Officer Does played prosecutor, judge, jury, and executioner in a manner which deprived Brenda of her right to notice that was "reasonably calculated, under all the circumstances, to apprise [her] of the pendency of the action." *Crum v. Vincent*, 493 F.3d 988, 993 (8th Cir. 2007).

239.    It is unclear whether Defendant officers even intended to arrest or detain Brenda
        or if this unreasonable force was applied to Brenda unlawfully for general crowd
        control.

240.    Defendant Does failure to effectuate an arrest after shooting of Brenda also leads
        to the inevitable conclusion that their action constituted a summary
        determination of guilt and execution of sentence in the form of delivering a
        "less-lethal" rubber bullet or similar projectile to Brenda's foot at a high rate of
        speed and with great physical force.

241.    Brenda was provided no notice of the officer(s)' intent to carry out this
        punishment and was accordingly deprived of her procedural due process rights.

242.    While procedural "[d]ue process is flexible and calls for such procedural
        protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S.
        319, 334 (1976) (internal citations omitted), by failing to inform Brenda of their
        intention to seize or shoot her, Defendant Does deprived Brenda of any process
        whatsoever.

243.    Given that the statutes in question demand she be given notice and satisfy
        particular criteria prior to having her person forcefully seized, she was due, at the
        very least, notice of the officers' intent to seize her (before being shot in the foot)
        as required by state statute. *See* MINN. STAT. § 629.33.

244.    Use of physical force by ambush and under color of law is not consistent with
        even the most basic principles of procedural Due Process.

245.   Even if Brenda had been notified that she was about to be placed under arrest or shot in the foot, which she was not, she was not attempting to flee officers' instructions or pose any reasonably objective threat to officers. Accordingly, she was deprived of her liberty interest in freedom from the use of force under MINN. STAT. §§ 629.33 and 629.32.

246.   As force is only authorized in the event of flight or forceful resistance, it was not necessary in Brenda's case and, accordingly, being shot in the foot with a rubber bullet or other projectile was unnecessary and infringed upon her liberty interests in freedom from forceful seizure.

247.   Furthermore, if Defendant Officers intended to encourage protesters to leave the scene, shooting Brenda in the foot defeated the purpose of getting her to exit the premises because it subsequently injured her ability to walk.

248.   Brenda suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

249.   Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 4: *Monell* and *Canton* Municipal Liability

(Plaintiff v. Minneapolis)

250.   For years, MPD officers have engaged in a policy and custom of using excessive force against unarmed civilians. The pervasiveness of this custom and notice to Minneapolis officials indicates it has been tacitly approved of by the City of Minneapolis.

251.    MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the City." MPD Policy Manual § 1-301 (citing City Charter reference-Chapter 6, § 1).

252.    The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD officers performing policing functions on behalf of the City.

253.    The Mayor, the City Council, and the Police Chief established and/or approved of MPD's written policies and training governing the conduct of MPD officers performing policing functions.

254.    The written policies and training established and/or approved by the Mayor, the City Council, and the Police Chief constituted the City's official policy and were the moving force behind and caused Plaintiff's injuries.

255.    The City, acting by and through its Mayor and/or other policymakers, had knowledge of MPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

256.   The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from MPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

257.   This custom has included the repeated and pervasive use of tasers and other "less-lethal" impact weapons against unarmed civilians posing no threat to officers.

258.   On or before May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the arrest or restraint process.

259.   On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by MPD officers.

260.   On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that condoned and required officers to treat members of the Black Community of Minneapolis differently, including but not limited to implementing non-deadly

force and deadly force at a higher rate against Black individuals who did not pose a threat to officers.

261. On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers refrain from submitting police reports that criticize their fellow officers' use of force even when an officer's use of force was excessive.

262. On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers who are responding to crowd control situations use excessive force, in the form of less-lethal ammunition, against nonviolent protesters who are doing no more than passively resisting officer commands.

263. On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices of refusing to discipline MPD officers who have committed misconduct including but not limited to using excessive force against civilians.

264. Minneapolis Police Spokesperson John Elder confirmed the use of less-lethal projectiles stating, "We use 40 mm less-lethal foam marking rounds. We do not use rubber bullets."

265. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of firing "less-lethal" projectiles indiscriminately at civilians in Minneapolis' public spaces.

266. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of using excessive force and impact weapons against suspected misdemeanants despite clear legal notice of the constitutional infirmity of such practice.

267. These customs and policies are reflected in the widespread use of force as well as warnings issued at the time suggesting that force would be used and that such practices has been authorized by Minneapolis, Mayor Frey, and Chief Arradondo.

268. Minneapolis officials, including Mayor Frey and Chief Arradondo approved of this excessive force, either explicitly through use of force policies or tacitly given the widespread reporting of extreme violence employed by MPD.

269. Minneapolis officials were aware of the customs and longtime *de facto* policies in place throughout MPD via settlements and media coverage but did nothing to reprimand the continued use of warrior training or, except in the most extreme cases, follow up on misconduct.

270. Because the City's chief of police has sole control over disciplining MPD police officers who have committed misconduct, any systematic routine failures to discipline MPD officers for misconduct is directly attributable to the City as a function of the City's custom of not disciplining the vast majority of police

officers who have committed misconduct as that term is defined by Section 172.20 of the Code. Moreover, because the custom flows from the direct actions of the City's chief of police, it is abundantly clear that Minneapolis knew this unlawful custom of under disciplining MPD police officers.

271.   On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents, including Lt. Bob Kroll, providing improper and harmful training to officers.

272.   Minneapolis had the power to terminate or appropriately discipline Kroll prior to May 30, 2020, but failed to do so despite the City's knowledge of Kroll's perpetuation of dangerous ideology to officers.

273.   By refusing to terminate or discipline Kroll or denounce his ideology, Minneapolis caused officers to act with impunity and without fear of retribution.

274.   On or prior to May 30, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, participated in contract negotiations with the Police Officers Federation of Minneapolis that granted officers powers that allowed them to avoid discipline for misconduct, including but not limited to:

    a.   A grievance process that resulted in a nearly 50% rate of overturns of terminations by officers;

    b.   The ability to review evidence and video footage prior to giving statements in use of force and misconduct matters;

275. This participation by the City of Minneapolis caused officers to act with impunity and without fear of retribution.

276. Minneapolis, through Chief Arradondo, and Mayor Frey exhibited the requisite "deliberate indifference" to constitutional rights to illustrate a custom or policy and for municipal liability to attach to police officer's conduct. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

277. This indifference was evidenced by city officials' recognition of the effect the curfew order would have on lawful protesters and their acknowledgement that legitimate, nonviolent, constitutionally protected protesters would be harmed during enforcement of the orders.

278. The implementation of the curfew order resulted in the foreseeable and widespread use of excessive force.

279. This level of force was authorized by city officials and the pervasiveness of the conduct illustrates a persistent and widespread custom throughout MPD of engaging in such practices as required for a showing of municipal liability. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

280. The custom of this level of force is evident throughout Minneapolis police practices, including firing less-lethal marking rounds at Black Lives Matter protesters in 2015.

281. Despite their knowledge of MPD's customs and practices, Minneapolis officials, including Frey and Arradondo, failed to implement measures to address them and as a result, the abuses set forth previously, and more, occurred during the

implementation of the Mayor's curfew orders despite the fact that most curfew violations did not factually constitute civil disturbances.

282. Pervasive use of excessive force, including the use of foam projectiles and chemical weapons against unarmed civilians, was widely reported by media and addressed by city and state officials in press conferences indicating they were well aware of the violations, yet police violence continued, and if anything, escalated throughout the period between May 28, 2020 and May 31, 2020. MPD could have changed tactics before May 30, 2020, but MPD opted not to.

283. The force authorized and the curfew order itself were facially unconstitutional as their immense breadth and failure to permit alternative forms of expression rendered them improper limitations of fundamental rights. Even if the force authorized and/or curfew order itself were facially constitutional, they were unconstitutional as applied to Plaintiff.

284. "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Minneapolis's municipal liability must attach because the policies themselves were unconstitutional.

285. Minneapolis has a variety of unconstitutional customs that were moving forces behind Plaintiff's injury, including:

    a. Between May 28, 2020 and May 31, 2020, Minneapolis adopted or established unconstitutional customs of:

    i.  Unlawfully seizing nonviolent protesters;

    ii.  Deploying chemical agents against individuals who are not actively resisting police and are not engaged in a civil disturbance;

    iii.  Failing to train MPD officers about the many exceptions to the curfew orders imposed by ERs 2020-2-1;

    iv.  Failing to supervise how MPD officers enforced the curfew orders imposed by ERs 2020-2-1; and

    v.  Treating all group violations of ERs 2020-2-1 as "civil disturbances" even when it was clear no "civil disturbance" was afoot and using chemical agents or less-lethal weapons against suspected misdemeanants.

b.  Between 2015 (or earlier) and May 31, 2020, Minneapolis has adopted or established unconstitutional customs of:

    i.  Using or condoning excessive force against nonviolent protesters;

    ii.  Failing to discipline police officers who use excessive force;

    iii.  Failing to train its police officers how to respect the First Amendment rights of protesters when responding to mass demonstrations or protests;

    iv.  Failing to supervise the police officers that are responding to mass demonstrations or protests; and

     v.  Selectively enforcing low-level criminal laws based on the suspect's race or content of expression in violation of the Constitution's Equal Protection Clause.

286.  Brenda suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

287.  The unconstitutional policies, practices, and customs defined herein were the moving force behind Plaintiff's injuries.

288.  Plaintiff's injuries occurred as a direct and proximate result of the acts and omissions by Minneapolis.

289.  As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

290.  Plaintiff is entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

### Count 5: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Brenda's Right to Freedom of Movement and Presence in Public

#### (Plaintiff v. Minneapolis, Does)

291.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

292.  Defendants' above-described conduct violated Brenda's rights to be present in public under the Fourteenth Amendment to the United States Constitution. *City*

*of Chicago v. Morales*, 527 U.S. 41, 53, (1999).

293.   By criminalizing the public presence of each and every Minneapolis resident or visitor for nearly half of the day, three days running, Mayor Frey's emergency regulation unduly burdened the fundamental rights of some 416,000 Minneapolis residents, many of whom lived nowhere near the sites of unrest centered around Lake Street on the city's south side and Broadway Avenue on the north.

294.   The massive overbreadth of this order renders it facially unconstitutional due to the enormous scale of constitutional infringements and its effect on the rights of more than 100,000 Minneapolis residents whose neighborhoods were entirely untouched by the unrest in the wake of George Floyd's murder.

295.   The massive overbreadth of this order also renders it facially unconstitutional as applied to Brenda. Brenda was targeted and attacked by police despite not being involved in any civil disturbance and despite her non-resistance.

296.   Mayor Frey's order was implemented on behalf of Defendant Minneapolis and enforced by Chief Arradondo and Does.

297.   As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Brenda suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

298.   As a direct and proximate result of Mayor Frey's order, Brenda also suffered a constitutional injury in the form of a limitation on her fundamental right to remain in public for innocent purposes.

299. Thus, Defendants violated the Fourteenth Amendment's Privileges and Immunities Clause, Article IV's Privileges and Immunities Clause, and 42 U.S.C. § 1983.

## Count 6: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Brenda's Rights to Substantive Due Process and Equal Protection Under Law

### (Plaintiff v. Minneapolis, Does)

300. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

301. Defendants' above-described conduct violated Brenda's rights to substantive due process and equal protection under the Fourteenth Amendment when they targeted enforcement of low-level criminal laws on the basis of (1) race or (2) content of expression.

302. Under the Equal Protection Clause, "the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).

303. A selective enforcement claim will succeed if plaintiff can show the law or policy was facially neutral but selectively enforced by defendants against people of the plaintiff's race with intent to discriminate. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). The Fourteenth Amendment prohibits local governments to criminalize the peaceful expression of views contrary to popular opinion. *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963). The primary way to determine content neutrality of speech "is whether the government has

adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 295 (1984)).

304.  Defendant Does, acting under the color of city policy, discriminated based on race when they retaliated with use of force against Brenda and other protesters arguing against police violence toward Black, Indigenous, and people of color.

305.  The facially neutral policies of crowd control through use of less-lethal projectiles were enforced to directly target people of color. As a Black woman, Brenda was targeted as a part of this discriminatory enforcement.

306.  The facially neutral policies of crowd control through less-lethal projectiles effectively criminalized and hampered free speech contrary to the government's opinion. Brenda joined protesters speaking out against police violence who were met with a violent response because the government disagreed with the content of the protesters' expression.

307.  As a direct and proximate result of Defendant Does' unconstitutional discriminatory use of force and the city condoning these actions, Brenda suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

308.  Thus, Defendants violated Brenda's Fourteenth Amendment's Rights to Substantive Due Process and Equal Protection Under Law.

**Count 7: 42 U.S.C. § 1983 – First Amendment Violation of Brenda's Rights to Freedom of Speech and Assembly**

(Plaintiff v. Minneapolis, Does)

309.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

310.   Defendants' above-described conduct violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

311.   Emergency Regulation 2020-2-1 was simply too broad to satisfy the strictures of constitutional inquiry.

312.   Defendants' interest is maintaining order was adequately served, or could have been adequately served, by measures implicating far less onerous constitutional limitations than the sweeping curfew orders employed.

313.   As outlined above, the unrest and fires that prompted Mayor Frey's order were confined to the area around the Third Precinct, along Lake Street on the city's south side and along Broadway Avenue on the city's north. Between and around these areas, much of the city was relatively calm and, in those areas, a sweeping order was unnecessary.

314.   Because Mayor Frey's order implicated rights secured under both the First and Fourteenth Amendments and because other options such as simply deploying the National Guard or administering a more localized ban on activity in affected areas offered less rights restrictive alternatives, Mayor Frey's emergency

declaration imposing a city-wide curfew was not properly tailored to Defendants'

interests and it cannot withstand a constitutional challenge.

315.   Because the curfew order was specifically intended to suppress speech during

certain hours, it swept up a substantial amount of legitimate speech unrelated to

the restoration of order, and it left few if any alternative avenues for expression

available.

316.   Mayor Frey's emergency curfew order constituted an unconstitutional conduct-

based restriction on Plaintiff's First Amendment rights.

317.   MPD's enforcement of Mayor Frey's curfew order constituted an

unconstitutional conduct-based restriction on Plaintiff's First Amendment rights,

as shown by MPD's massive and uncalled for use of force to break up a peaceful

assembly of persons who were protesting MPD on the pretextual grounds of

enforcing a curfew that was pretextually claimed by Minneapolis to be needed to

support the public health, safety, and welfare.

318.   If Emergency Regulation 2020-2-1 was not a content-based restriction, it

nonetheless constituted an unconstitutional limit of Brenda's First Amendment

rights under the "time, place and manner" analysis because the restraints

imposed were not reasonable.

319.   As a direct and proximate result of the enforcement of Mayor Frey's

unconstitutional emergency regulation, Brenda suffered great bodily harm

including but not limited to physical injury, financial injury, emotional trauma,

loss of access to justice, and pain and suffering.

320. As a direct and proximate result of Mayor Frey's order, Brenda also suffered a constitutional injury in the form of a limitation on her fundamental right to speak, assemble with likeminded protesters and seek redress for grievances related to MPD's unconstitutional conduct.

321. Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

### Count 8: Minn. Stat. § 466.02 – Battery

#### (Plaintiff v. Minneapolis, Does)

322. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

323. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

324. Minnesota Law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

325. Defendant Does committed such a battery when one of them aimed his weapon at Brenda and pulled the trigger causing his rubber bullet or projectile to offensively contact Brenda's foot causing significant injury.

326. Because Officer Does acted intentionally and with reason to believe that shooting an unarmed misdemeanant with a rubber bullet or other "less-lethal" projectile was legally prohibited, they are not entitled to official immunity.

327. The aforementioned precedent indicating that the use of "less-lethal" force such as a taser, as well as the manufacturers warnings that 40mm foam rounds

sufficiently incapacitate a single person provide enough warning that shooting an unarmed misdemeanant was unlawful and precludes a finding of official immunity.

328.  Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." MINN. STAT. § 466.02. This is subject to several exceptions including, pertinently, "claim[s] based upon an act or omission of an officer or employee, *exercising due care*, in the execution of a valid or invalid statute, charter, ordinance, resolution, or rule." *Id.* at subd.5 (emphasis added).

329.  As Officer Does failed to exercise due care when they fired upon Brenda without warning, municipal Defendant Minneapolis is not exempt from liability for Officers Does. *See Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (applying Minn. law) (precluding summary judgement granting immunity to either municipality or officer where decision turned on disputed fact determination).

330.  As a direct and proximate result of Defendant Does' actions, Brenda suffered great bodily harm including but not limited to physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

331.  Thus, Defendants committed an actionable intentional tort under Minnesota law.

## Count 9: Minn. Stat. § 466.02 – Assault

(Plaintiff v. Minneapolis, Does)

332. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

333. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

334. In shooting Brenda with a "less-lethal" projectile, Officers Does "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

335. Civil assault is present where Defendants engaged in an "unlawful threat to do bodily harm to another with present ability to carry the threat into effect" and conditions support a finding of that ability to carry out the threat. *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939).

336. Furthermore, "the display of force must be such as to cause plaintiff reasonable apprehension of immediate bodily harm." *Dahlin*, 288 N.W. 852.

337. Defendants threatened Brenda with weapons drawn and had a clear ability to carry out the threat of shooting her with less-lethal projectiles.

338. Within split seconds of the imminent threat, Defendants shot Brenda in the foot.

339. Defendant Does were equipped with militarized gear, held their weapons drawn, and were already exerting force against other protesters. These conditions sufficiently meet the standards to show Brenda's reasonable apprehension.

340.   As a direct and proximate result of Officer Does' conduct, Brenda suffered
emotional trauma.

341.   As a direct and proximate result of Defendant Does' actions, Brenda suffered
great bodily harm including but not limited to, physical injury, financial injury,
emotional trauma, loss of access to justice, and pain and suffering.

342.   Thus, Defendants committed an actionable assault tort under Minnesota law.

### Count 10: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Minneapolis, Does)

343.   Plaintiff realleges and incorporates herein by reference all preceding and all
subsequent paragraphs of this Complaint.

344.   Supplemental jurisdiction is proper given that this claim arises from a "common
nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

345.   In shooting Brenda with a "less-lethal" projectile, Officers Does "fail[ed] to act
as a reasonable and prudent police officer in the same or similar circumstance."
*Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

346.   Officer Does owed Brenda the duty of apprehending her in a constitutionally
reasonable manner.

347.   Officers Does owed Brenda a duty not to unnecessarily harm her in the execution
of her arrest or seizure.

348.   Officer Does breached both of these duties when he or she pointed his/her
weapon towards Brenda and pulled the trigger without any prior warning.

349.  As a direct and proximate result of Officer Does' conduct, Brenda was struck in the foot with a rubber bullet or foam projectile.

350.  As a direct and proximate result of Defendant Does' actions, Brenda suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

351.  Thus, Defendants committed an actionable negligence tort under Minnesota law.

### Count 11: Minn. Stat. § 466.02 –Negligent Infliction of Emotional Distress

(Plaintiff v. Minneapolis, Does)

352.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

353.  Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

354.  In shooting Brenda with a "less-lethal" projectile, Officers Does "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

355.  Aside from a claim of negligence, a plaintiff will prevail on a claim of negligent infliction of emotional distress if "she was within the zone of danger of physical impact [created by the defendant's negligence], reasonably feared for her own safety, and consequently suffered severe emotional distress with attendant physical manifestations." *Engler v. Illinois Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005) (internal citations omitted).

356.   Brenda was clearly within the zone of danger of physical impact because she was physically injured when shot as a result by one of the Defendant Officers.

357.   Along with other protesters, Brenda fearfully screamed in search of her daughter and attempted to leave the area as tear gas spread.

358.   She watched another protester be shot directly in the forehead and was unaware of the type of weapons being employed by police officers.

359.   Therefore, Brenda reasonably feared for her safety given the circumstances.

360.   On that day, Brenda's shaken demeanor plainly showed the manifestations of her intense fear following the shooting.

361.   As a direct and proximate result of Officer Does' conduct, Brenda suffered emotional trauma.

362.   As a direct and proximate result of Defendant Does' actions, Brenda suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

363.   Thus, Defendants committed an actionable negligent infliction of emotional distress tort under Minnesota law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    With regards to claims 1, 2, 3, 5, 6, and 7 (1983 claims), grant an award of compensatory and special damages in an amount to be determined at trial against one or more Defendants as compensation for Defendants' actions which caused Brenda to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Brenda's ongoing related costs and her loss of wages resulting from Defendant(s)' actions.

B.    With regard to claim 4 (*Monell* claim), grant an award of compensatory and special damages in an amount to be determined at trial against Defendant Minneapolis as compensation for Defendants' actions which caused Brenda to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Brenda's ongoing related costs and her loss of wages resulting from Defendant's actions.

C.    With regards to claims 1, 2, 3, 5, 6, and 7 (1983 claims), grant an award of punitive damages in an amount to be determined at trial against Defendant Does in order to punish their reckless and callous indifference towards Brenda's rights under the U.S. Constitution and Minnesota law, and to deter other members of MPD from committing similar grievous offenses in the future.

D.     With regards to claims 1 through 7 (1983 & *Monell* claims), grant an award of reasonable attorney's fees, non-taxable expenses and costs pursuant to 42 U.S.C. § 1988, or under any other relevant attorney fee statute.

E.     With regards to claims 8, 9, 10, and 11 (state law claims), grant an award of compensatory and special damages in an amount to be determined at trial against Defendant Does (or Defendant Minneapolis pursuant to MINN. STAT. § 466.02), or any combination thereof, as compensation for Defendants' actions which caused Brenda to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Brenda's ongoing related costs and her loss of wages resulting from Defendant(s)' actions.

F.     Grant such other relief as may be just and reasonable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.


DATED: June 7, 2021           Respectfully submitted,

                      /s/ *Nico Ratkowski*

                      NICO RATKOWSKI
                      MN Attorney ID: 0400413
                      Contreras & Metelska, P.A.
                      200 University Avenue W., STE 200
                      Saint Paul, Minnesota 55103
                      P: (651) 771-0019
                      F: (651) 772-4300
                      nico@contrerasmetelska.com

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for
   Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and
   he believes same to be true, and he further states that the sources of this
   information and belief are documents provided to him by Plaintiff, Defendant(s),
   and third-party witnesses.


DATED: June 7, 2021                    Respectfully submitted,

                                       /s/ *Nico Ratkowski*
                                       Nico Ratkowski
                                       MN Attorney ID: 0400413
                                       Contreras & Metelska, P.A.
                                       200 University Avenue W., STE 200
                                       Saint Paul, Minnesota 55103
                                       P: (651) 771-0019
                                       F: (651) 772-4300
                                       nico@contrerasmetelska.com

                                       *Attorney for Plaintiff*